UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| EMILY LAPRADE, et al., | Case No. 3:25-cv-05028-TMC |
| Plaintiffs, | ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE |
| v. | |
| VOLKSWAGEN AG, et al. | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiff Emily LaPrade has paraplegia with limited sensation in her lower body due to a spinal cord injury in 2014. While returning from a camping trip in September 2023, Ms. LaPrade rode in the front passenger seat of her family's 2023 Volkswagen Tiguan. She claims that she received second-degree burns after she used the vehicle's seat heater for 20–30 minutes on the highest setting, and one hour on the heater's middle setting.

In 2024, Ms. LaPrade and Jonathan LaPrade (together, "Plaintiffs") sued Defendant Volkswagen Group of America, Inc. ("Volkswagen" or "Defendant"),[1] arguing that the seat

---

[1] Volkswagen AG, a foreign corporation with its principal place of business in Wolfsburg, Germany, is also listed as a Defendant but "has not been served with the Complaint and has not answered or otherwise appeared." Dkt. 1-2 ¶ 1.2; Dkt. 1 ¶ 14.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 1

heater in their car was defective. The parties have agreed to dismiss some of Plaintiffs' claims, and Defendant now requests summary judgment on the remaining claims for defective design and a failure to warn under the Washington Product Liability Act ("WPLA"). Dkt. 17. Defendant has also filed a *Daubert* motion to exclude the testimony of Plaintiffs' expert, Roger Smedsrud. Dkt. 22.

For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Defendant's motion to exclude Mr. Smedsrud's testimony. Dkt. 22. The Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment. Dkt. 17. Only Plaintiffs' design defect claim will proceed to trial.

## II.    BACKGROUND

The following facts are either not genuinely disputed in the summary judgment record or are taken in the light most favorable to Plaintiffs.

### A.    Ms. LaPrade's preexisting injuries

On January 1, 2014, Ms. LaPrade was in a car accident that left her with no mobility below her hips and no sensation below her T10 vertebra. Dkt. 18-1 at 5–7.

Ms. LaPrade regained some lower body sensation in the years following the accident. *Id*. at 7. In her deposition, Ms. LaPrade described feeling a "little bit of tingling" from her T10 vertebra to her hips, "[l]ike if your arm went to sleep and then it was starting to wake up." *Id*. at 6. Ms. LaPrade described further reduced feeling from her hips to the middle of her thigh, noting that she could "feel pressure mostly." *Id*. She testified she could feel "light touches" in that region, but that "[i]t just feels like maybe you're wearing [] a puffy coat and someone's poking you." *Id*. at 6–7.

Shortly after the accident, Ms. LaPrade underwent occupational therapy, where hospital staff taught her "life skills to adjust to [her] condition." *Id*. at 8. Staff instructed Ms. LaPrade to

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 2

"be kind of hyperaware, very vigilant of [her] legs" to ensure that she wouldn't "injur[e] [her]self with either a knife or anything hot." *Id*. at 8–9. Ms. LaPrade testified that the staff's "concern [was] that [she] might burn [her]self and not realize." *Id*. at 9. She further noted that she was hospitalized after spilling soup on her hip and thigh in 2015. *Id.* at 10. She did not have any sensation of the spill "where it burned the worst" on her thigh, and medical staff told her "that it burned quickly because [her] skin is a little bit thinner there. There's no muscle mass, so it's just kind of skin and tissue." *Id*. She also experiences pressure sores on her ankles and tailbone from "[not] moving enough." *Id*. at 10–11. At the time of the deposition, Ms. LaPrade was healing from a pressure sore caused by spending "12 hours a day sitting in a recliner" with her daughter in the NICU. *Id*. at 11. This sore was exacerbated by the fact that her "skin was already thin from the scarring from the previous pressure sore." *Id*.

**B.      Ms. LaPrade's use of the seat heater on September 4, 2023**

On September 3, 2023, Ms. LaPrade traveled from Orting, Washington to the Potholes Reservoir and spent the night camping with Mr. LaPrade and a friend named Anna Lawrence. *Id*. at 16. The three left to return home the following evening, with Mr. LaPrade driving his 2023 Volkswagen Tiguan and Ms. LaPrade sitting in the front passenger seat. *Id*. at 17–18.

Roughly an hour into the two-and-a-half-hour drive to drop Ms. Lawrence off at her home in Issaquah, Ms. LaPrade turned her seat heater on at the highest of three available settings. *Id*. at 16–18. After feeling "a little bit warm" on her hip and lower back, she reduced the heater to the medium setting. *Id*. at 18. She then turned the heater off shortly before reaching Ms. Lawrence's house. *Id*. at 19. Ms. LaPrade estimated that the heater was at the highest setting for about 20 to 30 minutes and the medium setting for about an hour. *Id*. She testified that she changed positions multiple times during the drive, but that she did not get out of the vehicle when dropping off Ms. Lawrence or at any point before returning to her home in Orting. *Id*. at

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 3

18–19. Ms. LaPrade did not notice any injury until she returned home. *See id.* at 19 ("I pulled my pants down to use the restroom and felt something on my butt, on my left side of my butt. And so I took my phone camera out to look, and noticed that there was what looked like a . . . pretty big blister forming. So I just consciously tried to stay off of it. . . . And then when I woke up the next morning, . . . the outer skin of the blister had come off. It didn't look super great.").

The Tiguan owner's manual contains the following warning regarding use of the vehicle's seat heaters:

Dkt. 21-1 at 3. Ms. LaPrade testified that she had never read the Tiguan owner's manual and was not aware of this warning until after September 4, 2023. Dkt. 18-1 at 21–22. She noted that her doctors had previously recommended she use heating pads for her hip and back pain, and that "it never crossed [her] mind that [she] could get burned" by the seat heater. *Id.* at 22. She testified that she had used heating pads, electric blankets, and seat heaters without incident. *Id.* at 22–23. She had even used the seat heater in the Tiguan at the highest setting, including during the drive to the Potholes Reservoir on the morning of September 3, 2023. *Id.* at 15–17.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 4

**C.    Medical evidence**

Ms. LaPrade went to the emergency room on September 7, 2023, after concerns that her wound from three days prior had become infected. Dkt. 30-1 at 42. Dr. Jan Zemplenyi, Plaintiffs' expert, reviewed Ms. LaPrade's medical records and summarized them as follows:

> [Ms. LaPrade] was [a] 28-years-old woman suffering from T10 paraplegia due to spinal cord injury due to a car accident in 2013 and had lost much sensitivity in her nerves. She was a front-seat passenger in her family's 2023 Volkswagen Tiguan being driven by her husband. Due to the pre-existing nerve damage, Ms. LaPrade and her husband were initially unaware of her injuries. Because of signs and symptoms of infection three days after the incident, Ms. LaPrade went to the Emergency Room at Good Samaritan Hospital in Puyallup. The health care providers documented the two ulcerated wounds on the left buttock approximately four centimeters by six centimeters in width . . . and they diagnosed as second-degree burn wounds and cellulitis. . . . Ms. LaPrade received four doses of intravenous meropenem while awaiting possible hospitalization for overnight inpatient care. However, due to a bed shortage, she was judged stable enough to receive once daily IV ertapenem antibiotic for seven days and wound care at home. She was prescribed anti-nausea medication and oxycodone.

*Id*. at 42–43. Dr. Zemplenyi noted that Ms. LaPrade followed up for further wound care multiple times through late 2023, and then again in January 2024 when "her atrophic scar wound partially opened up." *Id*. at 43.

Dr. Zemplenyi concluded that "Ms. LaPrade's two ulcerated wounds of the left buttock were consistent with a second-degree, partial depth burn," and that "[t]he right buttock had a much more superficial area of reddened skin consistent with a superficial, first-degree burn." *Id*. at 45. He added that "[p]artial thickness burns are normally initial[ly] painful, but in the presence of T10 paralysis I would expect the sensation of pain to be minimal, altered or absent, consistent with Ms. LaPrade's lack of awareness of the excess heat that initially caused the burn." *Id*. Dr. June A. Burn, the emergency medicine physician who treated Ms. LaPrade, also diagnosed her with two second-degree burn wounds on her left buttock. *Id.* at 61–62.

Defendant's expert, Dr. Erik Brand, did not characterize Ms. LaPrade's injury as a burn. *Id.* at 39–40. Instead, he found the injury was "more likely than not" caused by a "multifactorial" combination of "prolonged sitting without pressure relief, impaired sensation from T10 paraplegia (SCI), pressure/shear forces over bony prominences, moisture/incontinence risks, prior tissue compromise from earlier burns and prior decubitus pressure ulcerations of bilateral ischium, bilateral greater trochanters, coccyx and lifestyle factors (including nicotine vaping), rather than a single thermal mechanism alone." *Id*. at 40.

Although Dr. Brand did not opine on the "precise apportionment" of the various causes, he concluded that "the evidence favors a multifactorial injury mechanism dominated by pressure ulcer formation with possible secondary thermal contribution, rather than an isolated acute thermal burn." Dkt. 18-4 at 12. To explain "[w]hy pressure beats heat," Dr. Brand posited that "[a] warm seat can lower skin tolerance, but the long, unbroken sit does most of the harm." *Id*. As evidence for this theory, Dr. Brand cited Ms. LaPrade's history of pressure ulcers, her previous use of the seat heater without incident, her clothing (spandex biking shorts and sweatpants) as being more likely to trap heat and moisture and lower tissue tolerance, the three-hour sitting time versus only one-and-a-half hours of heating, the delayed worsening of the wound, and the fact that "unilateral focal lesions match asymmetric load/lean, not an even heat pattern." *Id*. at 12–20.

## D.    Roger Smedsrud's report

Plaintiffs hired forensic mechanic Roger Smedsrud as an expert to inspect their Tiguan and opine on the safety of the seat heater used by Ms. LaPrade. Dkt. 18-3 at 18–26; Dkt. 30-1 at 7. Using a diagnostic tool connected to the vehicle's data link connector and an infrared thermometer, Mr. Smedsrud measured the temperature of both front seats with the heaters on to the highest setting. Dkt. 18-3 at 18. He observed that both seats reached a maximum of 126.5

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 6

degrees Fahrenheit and remained at that temperature. *Id*. at 22–26. He concluded that "the temperatures set in this vehicle heated seat system are set too high from the factory." *Id*. at 26.

**E.    Uwe Meissner's report**

Defendant hired mechanical engineer Uwe Meissner to inspect Plaintiffs' Tiguan and opine on (1) whether the front passenger seat heater "was defective in that it generated sufficient heat to cause injury" to Ms. LaPrade and (2) whether Defendant "failed to provide adequate warnings or instructions" for the seat heater. Dkt. 20-2 at 2.

With respect to the first issue, Dr. Meissner conducted temperature tests of the seat on August 14, November 21, and December 4, 2025. *Id*. at 5–10. During each test, Dr. Meissner used sensors on the surface of the seat or on his skin to measure temperatures while the heater was set to the maximum or medium setting. *Id*.

On August 14, Dr. Meissner conducted two tests on maximum heat at 45 minutes. *Id.* at 6. He observed temperatures ranging from 70 to 120 degrees Fahrenheit while the seat was unoccupied and 72.5 to 123 degrees while it was occupied. *Id*. He also used a thermal imaging device to find "damaged areas like melted or burned material . . . [or] hot spots and/or discontinuities in the wiring" and found none. *Id*. at 7.

On November 21, Dr. Meissner conducted three tests for 20 minutes. *Id.* at 8. With the heat set to maximum, he observed temperatures of 59 to 94 degrees Fahrenheit while the seat was unoccupied and 68 to 122 degrees while the seat was occupied. *Id*. at 8–9. Dr. Meissner conducted the third test on the middle heat setting while the seat was occupied and observed temperatures of 64 to 100 degrees. *Id*. at 9.

On December 4, Dr. Meissner conducted one test on maximum heat for 45 minutes. *Id.* at 10. Sitting in the seat, Dr. Meissner kept four sensors on the top of the seat cushion and attached two sensors to his skin "at the upper thigh where the pelvic/femur joint is located." *Id*. He

observed temperatures of 98 to 107 degrees Fahrenheit on his skin and 108 to 113 degrees on the seat. *Id*.

Dr. Meissner then compared these temperatures to standards adopted by the Society for Automotive Engineers ("SAE") and the American Society for Testing and Materials ("ASTM"). *Id*. at 13–15. Referring to SAE J3047,[2] Dr. Meissner noted that the recommended temperature setting "for any length of exposure" was 43 degrees Celsius, or 109.4 degrees Fahrenheit. *Id*. at 13. For higher temperatures, SAE J3047 gives a "threshold temperature for first degree burns" based on the length of time someone is exposed to that temperature. *Id*. As the temperature of a seat heater increases, the time someone can use the seat before they risk a first-degree burn decreases. *Id*. Dr. Meissner included the following graph from SAE J3047 to explain this relationship:



*Figure 1 - Time/temperature limit for first degree burn threshold, extrapolated for longer durations*

---

[2] "Recommendation for Acceptable Operating Parameters of Heated Automobile Seats in Order to Mitigate Occupant Injury." Dkt. 20-2 at 13.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 8

*Id.*[3]

Dr. Meissner also asserted that Mr. Smedsrud failed to follow testing recommendations set by the SAE and the International Organization of Standardization ("ISO"). *Id.* at 12. "Specifically, he did not conduct testing on the surface of a test subject's skin, consistent with industry standards" and "simply measured temperatures on the surface of the seat, without an occupant." Dkt. 20 ¶ 9; *see* Dkt. 20-2 at 12–13.

Dr. Meissner concluded that "[t]he design of the seat heater follows the recommendations of SAE and ISO," which "recommend the temperature for long time exposure to be set to 43 degrees Celsius as a maximum operating temperature setting. At periods of shorter time exposure this temperature can be increased, for example to improve customer [sic] in a cold cabin vehicle at start up." Dkt. 20-2 at 15. Based on these recommendations and "the testimony of [P]laintiffs on the lengths of the exposure to the seat heater at the maximum setting," Dr. Meissner opined that Ms. LaPrade "should not have received these injuries. . . . The time of exposure to this heating system at its maximum setting is too short to create this type of injury." *Id*.

---

[3] Despite referencing SAE J3047, Dr. Meissner did not attach the full standard to his report. Dkt. 20-2 at 13–14. When Plaintiffs attached a highlighted copy of the document to their summary judgment response, Dkt. 30-1 at 20–24, Defendant objected to the "wholesale admissibility" of the document—arguing that it is "inadmissible hearsay for which no exception exists." Dkt. 33 at 3.

When evaluating these objections, the Court focuses on whether the content of the evidence—not its form—may be admissible at trial. *Sandoval v. County of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). Federal Rule of Evidence 705, for example, provides that an expert may be required to disclose underlying facts or data that informed his opinion, and FRE 803(18) provides for the admission of statements contained in treatises, periodicals, or pamphlets during the questioning of an expert witness. Even without definitively ruling on the admissibility of SAE J3047, however, Plaintiffs survive summary judgment based only on portions of SAE J3047 that are included in Dr. Meissner's report. *See infra* Section VI.B.

### III.    PROCEDURAL HISTORY

Plaintiffs originally filed their complaint in Pierce County Superior Court on December 17, 2024. Dkt. 1-2. Defendant removed the case to this Court on January 13, 2025, and Plaintiffs did not contest removal. Dkt. 1.

On February 10, 2026, Defendant moved for summary judgment on all of Plaintiffs' claims. Dkt. 17. That same day, Defendant filed a motion under Federal Rule of Evidence 702 to exclude Mr. Smedsrud as Plaintiffs' expert. Dkt. 22. Plaintiffs responded to both motions, and Defendant replied. Dkts. 26, 28, 29, 33. The Court heard oral argument on April 8. Dkt. 37.

While the summary judgment motion was pending, the Court granted the parties' stipulated motion to dismiss Plaintiffs' claims for defective and negligent construction, leaving "only a design defect theory and defective warning theory" under the WPLA. Dkts. 23, 24. Plaintiffs also concede that Mr. LaPrade does not have a valid claim to loss of consortium. Dkt. 29 at 16.

### IV.    JURISDICTION

The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the opposing parties are citizens of different states. Plaintiffs are citizens of Washington, while Defendant is a citizen of Virginia and New Jersey. Dkt. 1-2 ¶¶ 1.1, 1.3; Dkt. 6; *see* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."). Plaintiffs claim roughly $500,000 in damages. Dkt. 8 at 3. Because the Court is sitting in diversity, the substantive claims are governed by Washington law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

## V.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson*, 477 U.S. at 256).

The evidence relied upon by either party must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

## VI.    DISCUSSION

### A.    Defendant's *Daubert* motion

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Testimony is permitted if it is "both relevant and reliable." *Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) (quoting *United States v. Vallejo*, 237 F.3d 1008, 1119 (9th Cir. 2001), *opinion amended on denial of reh'g*, 246 F.3d 1150 (9th Cir. 2001)), *overruled on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020). Before trial, "[t]he trial court acts as a 'gatekeeper' to exclude expert testimony that" does not meet these standards. *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1193, 1201 (D. Nev. 2008) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999)).

Prior to a witness appearing "before the jury cloaked with the mantle of an expert," the Ninth Circuit has cautioned that "care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of Rule 702." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001). Thus, as a threshold matter, the court must determine whether a proffered witness is "qualified as an expert by knowledge, skill, experience, training, or education." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (quoting Fed. R. Evid. 702). This "standard is liberal" and an expert "need only exceed the common knowledge of the average layman." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (citation modified). "[W]hether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion." *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir. 1993) (quoting *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984)). But even a qualified expert may only testify if the opinions he offers are both relevant and reliable.

Expert testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc. ("Daubert I")*, 509 U.S. 579, 591 (1993); *see* Fed. R. Evid. 702(a); *see also Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1315 (9th Cir. 1995) (explaining that relevant evidence is that which "logically advances a material aspect of the proposing party's case"), *cert. denied*, 516 U.S. 869 (1995).

Expert testimony is reliable if it is "based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b), (c), (d). More generally, evidence is reliable "if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (alteration in original) (quoting *Kumho Tire*, 526 U.S. at 149). In *Daubert*, the Supreme Court set out several factors that courts may consider in determining reliability:

> (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted.

*Neal-Lomax*, 574 F. Supp. 2d at 1201 (quoting *Daubert I*, 509 U.S. at 593–94). But these factors are not a "definitive checklist or test," *see Daubert I*, 509 U.S. at 593, and "[i]n other cases, the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150. Nor do the *Daubert* factors "necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Id.* at 151. Rather, "Rule 702 grants the district judge the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case." *Id.* at 158; *see also Hangarter*, 373 F.3d at 1017 ("[A] trial court not only has broad latitude in determining whether an expert's testimony is reliable,

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 13

but also in deciding how to determine the testimony's reliability." (internal quotation marks omitted)).

"Generally, an inquiry under Rule 702 examines the expert's testimony as a whole." *United States v. W. R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007). The proponents of expert testimony bear the burden of establishing its admissibility over the objections of the opposing party by a preponderance of the evidence. *Daubert I*, 509 U.S. at 592 n.10; *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). District courts "must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted) (quoting *Desrosiers v. Flight Int'l of Fla. Inc.*, 156 F.3d 952, 960 (9th Cir. 1998)).

Defendant challenges both the relevance and reliability of Plaintiffs' expert, Mr. Smedsrud. Dkt. 22 at 7–13. Specifically, Defendant argues (1) that Mr. Smedsrud "lacks any specialized knowledge that will aid the jury in determining whether there is a defect with respect to the seat heater" and (2) that his opinions—including his conclusion that the temperature of the seat was "too high"—are speculative and unsupported by "any scientific literature, industry standards, or factory specifications." *Id*. at 7–11.[4]

For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendant's motion. Dkt. 22.

*1.      The Court will permit testimony regarding Mr. Smedsrud's test results.*

Mr. Smedsrud is a forensic mechanic specializing in accident reconstruction. Dkt. 30-1 at 7. His C.V. lists significant formal training on a variety of vehicles, 32 years of experience as a

---

[4] Defendant also argues that Mr. Smedsrud's testimony should be excluded as irrelevant and substantially more prejudicial than probative for the same reasons. Dkt. 22 at 11–13 (citing Fed. R. Evid. 401, 402, 403).

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 14

mechanic, and "over 3000 mechanical inspections" of vehicles involved in "traffic collision[s], equipment accidents, [or] fraud." *Id*. He lists "[c]omputer diagnostics" as a specific area of experience. *Id.* at 8.

Mr. Smedsrud is qualified to testify about the seat heater temperatures he observed via infrared thermometer and diagnostic data from Plaintiffs' Tiguan. Dkt. 18-3 at 18–26. The liberal standard of Federal Rule of Evidence 702 requires only that the proffered expert's "knowledge, skill, experience, training, or education" exceed "the common knowledge of the average layman." *Holguin*, 51 F.4th at 854 (first quoting Fed. R. Evid. 702; and then quoting *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002)); *see Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) (explaining that Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert"). Mr. Smedsrud's significant experience in vehicle repairs, diagnostic systems, and accident reconstruction qualifies him to testify about the tools he used, tests he performed, and data he collected during his examination of Plaintiffs' vehicle.

Defendant contends that Mr. Smedsrud's testimony in this area is unreliable or irrelevant because "he did not design or conduct his testing in accordance with any SAE or ISO guidelines." Dkt. 22 at 10; *see* Dkt. 18-3 at 8–9. Specifically, Mr. Smedsrud "did not conduct testing on the surface of a test subject's skin" but "simply measured temperatures on the surface of the seat, without an occupant, much less at the skin surface of an occupant." Dkt. 20 ¶ 9; *see* Dkt. 20-2 at 12. Mr. Smedsrud unequivocally testified that he was familiar with SAE and ISO standards but did not rely on either in gathering data or formulating his opinion. Dkt. 18-3 at 8–9.

"[T]hese are deficiencies fit for cross-examination, not exclusion." *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F. Supp. 3d 1342, 1349 (W.D. Wash. 2020). Mr. Smedsrud's background and experience are sufficient for him to testify about the data he gathered. That he did not refer to a

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 15

specific standard does not necessarily invalidate the temperature readouts themselves. Indeed, Dr. Meissner also conducted two tests with no occupant in the seat. Dkt. 20-2 at 6, 8. The Court finds no reason that either expert could not testify about the temperatures they observed during those tests.

The Court therefore DENIES Defendant's motion to exclude with respect to Mr. Smedsrud's testimony about his test results. Dkt. 22.

2. *The Court will exclude testimony regarding the design or safety of the seat heater.*

Defendant asks the Court to exclude Mr. Smedsrud's testimony about the design of the Tiguan's seat heater—namely, his conclusion "that the temperatures set in this vehicle heated seat system are set too high from the factory." Dkt. 18-3 at 26. Defendant raises multiple issues, including that Mr. Smedsrud (1) has no background in vehicle design; (2) did not refer to relevant SAE or ISO standards; (3) and did not conduct any measurements on vehicles other than Plaintiffs' Tiguan. Dkt. 22 at 7–10.

Mr. Smedsrud is not qualified to offer opinions about the design or safety of the Tiguan's seat heater. Mr. Smedsrud's opinion does not discuss any standard by which he judged the temperature of the seat heater to be "too high." Dkt. 18-3 at 18–26. He testified that he did not rely upon SAE or ISO standards, and that that he was unaware of "any publication that sets the maximum reasonable temperature for a seat heater." *Id*. at 9, 14. Instead, he formed his conclusion upon the fact that he had "never seen one this high before." *Id*. at 12. But as Defendant notes, Mr. Smedsrud has never investigated an incident where someone was injured from a seat heater. Dkt. 22 at 2 (citing Dkt. 18-3 at 5). He has only ever repaired a seat heater once—in his own Toyota, after the seat heater stopped working entirely. Dkt. 18-3 at 5–6.

The "prerequisite to making the Rule 702 determination that an expert's methods are reliable requires the district court to assure that the methods are adequately explained." *United*

*States v. Valencia-Lopez*, 971 F.3d 891, 900 (9th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002)). Nowhere in his report does Mr. Smedsrud explain what makes a seat heater temperature "too high." Dkt. 18-3 at 18–26. Mr. Smedsrud was asked about four relevant standards during his deposition and consistently indicated that he did not rely on these standards—or on *any* standard—in making his conclusion. *See, e.g.*, *id*. at 8–9 (noting that he knew about SAE J3047 but did not refer to it because "my findings were my findings, and I'm not looking [at] anything . . . my determination is what I have found in a physical sense—in a technical sense"); *id*. at 12 ("Well, when I say something is too high . . . like what you said on the SAE guideline area, you know, between 100—what is it, 105, 110? Somewhere in that ballpark. And I've never seen one this high before.").[5]

Plaintiffs argue that, even if Mr. Smedsrud did not rely on any standard, the SAE and ISO standards support his conclusion that the temperatures of the seat heater were indeed "too high." Dkt. 26 at 2. But this is irrelevant to the Rule 702 inquiry, which focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert I*, 509 U.S. at 595; *see Sonneveldt v. Mazda Motor of Am., Inc.*, No. 23-55325, 2024 WL 5242611, at *2 (9th Cir. Dec. 30, 2024) (affirming the district court's finding that the expert "did not satisfactorily explain or support the methodology he employed, thereby failing to satisfy FRE 702, which 'screen[s] the jury from unreliable nonsense opinions'" (alteration in original) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013))). The Ninth Circuit has made clear that the dispositive question is "whether an expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory

---

[5] During oral argument, Plaintiffs' counsel posited that Mr. Smedsrud relied upon SAE J3047 but neglected to reference the standard in his report. These portions of Mr. Smedsrud's deposition undermine that assertion.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 17

approach that cannot reasonably be assessed for reliability.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). Mr. Smedsrud's methodology is the latter.[6]

The Court therefore GRANTS Defendant's motion to exclude with respect to Mr. Smedsrud's testimony about the design or safety of the Tiguan's seat heater. Dkt. 22. Having addressed Defendant's *Daubert* motion, the Court turns to Plaintiffs' claims under the WPLA.

## B.    Defective design

Plaintiffs claim that the seat heater in their Volkswagen Tiguan was defectively designed because it ran at unreasonably high temperatures and caused Ms. LaPrade to suffer second-degree burns. Dkt. 1-2 at 4–5; Dkt. 29 at 3–11. Defendant argues that (1) the design of the Tiguan's seat heater was not defective, and (2) Ms. LaPrade's injuries were not proximally caused by any defect. Dkt. 17 at 8–12. Finding that there are material disputes of fact on both issues, the Court concludes that Defendant is not entitled to summary judgment on the design defect claim.

To prove a design defect in violation of the WPLA, "a plaintiff must show (1) a manufacturer's product (2) was not reasonably safe as designed and (3) caused harm to the plaintiff." *Thongchoom v. Graco Child.'s Prods., Inc.*, 117 Wn. App. 299, 304, 71 P.3d 214 (2003) (citing *Bruns v. PACCAR, Inc.*, 77 Wn. App. 201, 208, 890 P.2d 469 (1995)). "Two

---

[6] Plaintiffs also argue that Mr. Smedsrud's testimony "is not 'scientific' and thus *Daubert* standards do not apply." Dkt. 26 at 2 (citing *Carmichael v. Samyang Tire, Inc.*, 131 F.3d 1433 (11th Cir. 1997), *rev'd sub nom. Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). Plaintiffs neglect to mention that the Supreme Court reversed the Eleventh Circuit in *Kumho Tire* and rejected this distinction. 526 U.S. at 147–149; *Azzinaro v. Shyft Grp. Inc.*, No. CV-21-01990-PHX-JJT, 2023 WL 6059808, at *1 (D. Ariz. Sept. 18, 2023) ("The *Daubert* analysis is applicable to testimony concerning scientific and non-scientific areas of specialized knowledge." (citing *Kumho Tire*, 526 U.S. at 141)). Mr. Smedsrud's testimony is "specialized" or "technical" even if not "scientific," and thus governed by Rule 702 and the *Daubert* analysis.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 18

alternative tests may be used to establish that a product was not reasonably safe as designed: the risk-utility test and the consumer expectations test." *Id*. (citing *Bruns*, 77 Wn. App. at 209).

First, the record contains sufficient evidence from which a reasonable juror could find a defective design under the consumer expectations test.[7] Under this test, the Court must "consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer." *Falk v. Keene Corp.*, 113 Wn.2d 645, 650, 782 P.2d 974 (1989) (quoting RCW 7.72.030(3)). Relevant factors include (1) "the relative cost of the product"; (2) "the gravity of the potential harm from the claimed defect"; (3) "the cost and feasibility of eliminating or minimizing the risk"; (4) "the nature of the product"; (5) "the nature of the claimed defect"; and (6) "whether or not the product was in compliance with nongovernmental standards or with legislative or administrative regulatory standards." *Id*. at 649, 654 (first quoting *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 154, 542 P.2d 774 (1975); and then citing RCW 7.72.050(1)). Defendant's own evidence addresses several of these factors.

Critically, Dr. Meissner conducted at least two tests where the Tiguan's seat heater reached temperatures exceeding first-degree burn thresholds provided by the SAE J3047 standard. Dkt. 20-2 at 6, 9. His tests on August 14 and November 21, 2025—both performed at the heater's highest setting with an occupant in the seat—measured sustained temperatures of 123 degrees and 122 degrees Fahrenheit (about 50 degrees Celsius), respectively. *Id*.

---

[7] Plaintiffs argue that the available evidence would also satisfy the risk-utility test, which requires showing that "the likelihood that the product would cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighed the manufacturer's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have on the product's usefulness." Dkt. 29 at 11–12; *Thongchoom*, 117 Wn. App. at 304 (quoting *Lecy v. Bayliner Marine Corp.*, 94 Wn. App. 949, 960, 973 P.2d 1110 (1999)). The Court need not address these arguments because it has already determined that Plaintiffs' design defect claim survives summary judgment under the consumer expectations test.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 19

Included in Dr. Meissner's report, one graph from SAE J3047 displays an "accumulated heat caution area" above 43 degrees Celsius, or 109.4 degrees Fahrenheit. *Id*. at 13; *supra* Section II.E. That area "provides a threshold temperature for first degree burns based on experimental data." Dkt. 20-2 at 13. In other words, while 109.4 degrees Fahrenheit "is acceptable for able[] bodied passengers for any length of exposure," higher temperatures can only be sustained for a limited time before the passenger risks burning themselves. *Id*. The higher the temperature, the shorter time someone can be exposed without risk. *Id*. A review of the graph indicates that 45 degrees Celsius takes about two hours to exceed the threshold, 46 degrees takes one hour, and 47 degrees takes about 20 to 30 minutes. *Id*. Temperatures above 47 degrees Celsius have very short threshold times—the exposure time for 50 degrees Celsius barely registers on the x-axis of the graph, indicating that a 50-degree seat is unsafe after just a few minutes. *Id*.

On two separate days, Dr. Meissner observed seat temperatures reach roughly 50 degrees Celsius and remain around that temperature for well past the time threshold provided by SAE J3047. *Id*. at 6, 9, 13. These temperatures also appear to exceed a threshold from the American Society for Testing and Materials ("ASTM") which Dr. Meissner cites in his report. *See id*. at 14 (indicating that "reversible epidermal injury" occurs at about 100 seconds of exposure to 50 degrees Celsius and that "transepidermal necrosis (cell death)" occurs after several minutes). The violation of these safety standards might lead a juror to reasonably conclude that the Tiguan's seat heater was "unsafe to an extent beyond that which would be contemplated by the ordinary consumer." *Falk*, 113 Wn.2d at 650.

Defendant argues that Ms. LaPrade is not the "ordinary consumer" because of her paraplegic condition and reduced sensation. Dkt. 33 at 3–4. But while it is true that the ordinary consumer might have full sensation and "expect that use of a seat heater at the maximum settings

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 20

would produce heat," *id*. at 4, that consumer might not expect first-degree burns from just a few minutes of use. Even a consumer with full sensation might fall asleep or otherwise suffer prolonged exposure to these temperatures without quickly realizing the need to turn the seat heater off. Whether this exceeds the danger contemplated by the ordinary consumer is a question for the jury. *Kirkland v. Emhart Glass S.A.*, 805 F. Supp. 2d 1072, 1080 (W.D. Wash. 2011) ("[I]t is a question for the jury to determine what the ordinary consumer would expect in terms of product safety.").

Other evidence in Dr. Meissner's report and the broader record could further support a jury's finding of a design defect. Dr. Meissner cited portions of SAE J3047 addressing the feasibility for manufacturers to reduce the risk of heat injury via mechanical limitations:

> There are several possible methods to limit the heater performance into this area under the limit curve. For example, an ECU within the heater system could receive temperature feedback . . . and limit the heater power. A simpler method is to set the maximum operating temperature to 43 [degrees Celsius], controlled by a thermostat. Alternatively, the heater controller may have an auto adjustment feature that turns the heater down or off before it exceeds the limit curve threshold temperature.

Dkt. 20-2 at 14. Medical evidence also supports that Ms. LaPrade may have suffered second-degree burns from her use of the seat heater—lending further to the "gravity of the potential harm from the claimed defect." Dkt. 30-1 at 43, 62; *Falk*, 113 Wn.2d at 649 (quoting *Tabert*, 86 Wn.2d at 154). Finally, Ms. LaPrade testified that "it never crossed [her] mind that [she] could get burned from something like that." Dkt. 18-1 at 22.

Plaintiffs point to evidence about the gravity of potential harm from the defect, the nature of the product, the nature of the claimed defect, noncompliance with governmental standards, and potential ways to mitigate or eliminate the risk of harm. Although they have not provided evidence on the relative cost for Defendant to eliminate or mitigate that risk, the *Falk* factors are

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 21

flexible and Plaintiffs are not required to make a showing on each factor. Taken together and viewed in the light most favorable to Plaintiffs, the facts above show a genuine issue for trial.[8]

Second, a material dispute of fact exists as to whether the seat heater caused Ms. LaPrade's injuries. Plaintiffs' evidence includes (1) Dr. Burn's testimony that she treated Ms. LaPrade for two second-degree burns on her left buttock, Dkt. 30-1 at 62, and (2) Dr. Zemplenyi's expert opinion that Ms. LaPrade suffered two ulcerated wounds "consistent with a second-degree, partial depth burn" on her left buttock and reddened skin "consistent with a superficial, first-degree burn" on her right buttock. *Id*. at 45. Although Defendant's expert posits that Ms. LaPrade's injuries were "multifactorial" and more likely due to her prolonged sitting and other complications of paraplegia, *id*. at 40, "weighing of evidence and drawing legitimate inferences from facts are jury functions, and not the function of the court." *Lewis v. Ferguson*, No. 319CV05108BHSJRC, 2022 WL 18999843, at *5 (W.D. Wash. Dec. 7, 2022) (citing *United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989)), *report and recommendation adopted*, No. C19-5108 BHS-JRC, 2023 WL 2071810 (W.D. Wash. Feb. 17, 2023); *see Gloria v. Home Depot, Inc.*, No. C 08-01672 JW, 2009 WL 10695686, at *4 (N.D. Cal. Apr. 30, 2009) ("[T]he jury must assess the credibility of competing expert opinions."). Plaintiffs' evidence is sufficient to survive a summary judgment motion.

---

[8] Even ignoring other evidence in the record, Dr. Meissner's report is likely enough to preclude summary judgment. "[W]here the moving party cites evidence that, on its face, presents genuine issues of material fact," that party fails to meet its burden under Rule 56(a). *Daniel v. United States*, No. 24-6821, 2025 WL 3654682, at *3 n.3 (9th Cir. Dec. 17, 2025). Plaintiffs are free to present this evidence during their case-in-chief. "A witness identified as a testimonial expert is available to either side." *SEC v. Koenig*, 557 F.3d 736, 744 (7th Cir. 2009); *see Peterson v. Willie*, 81 F.3d 1033, 1037–38 (11th Cir. 1996) ("Once a witness has been designated as expected to testify at trial, there may be situations when the witness should be permitted to testify for the opposing party."); *NetAirus Techs., LLC v. Apple, Inc.*, No. LA CV10-03257 JAK EX, 2013 WL 9570686, at *1 (C.D. Cal. Nov. 11, 2013) (allowing a party to call an adverse party's expert during its case-in-chief).

The Court therefore DENIES Defendant's motion for summary judgment on Plaintiffs' design defect claim under the WPLA. Dkt. 17.

**C.      Failure to warn**

Plaintiffs bring a claim under the WPLA for Defendant's failure to warn about the risks of injury from use of the seat heater. Dkt. 1-2 ¶¶ 4.3–4.5; Dkt. 29 at 13–14 (citing RCW 7.72.030). Plaintiffs acknowledge that there are several warnings in the Tiguan's manual regarding the seat heater, including one stating that "[p]eople with a limited perception of pain and/or temperature must never use the seat heating and seat ventilation functions." Dkt. 29 at 13; Dkt. 21-1 at 3. Plaintiffs nevertheless argue that Defendant should have attached a warning "on or near the seat heater controls themselves, which would have been more effective in alerting users to potential dangers." Dkt. 29 at 14.

Under the WPLA, a product is "not reasonably safe because adequate warnings" were not provided if "the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate" *and* "the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." RCW 7.72.030(1)(b). "As with a claim of defective design, a plaintiff may thus establish liability through either [the] 'risk-utility' test or the 'consumer expectations' test of RCW 7.72.030(3)." *Anderson v. Weslo, Inc.*, 79 Wn. App. 829, 838, 906 P.2d 336 (1995) (citing *Ayers ex rel. Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 765, 818 P.2d 1337 (1991)). The plaintiff must also "show that [a] defendant's inadequate warnings were the proximate cause of their injuries." *Kirkland*, 805 F. Supp. 2d at 1077 (citing RCW 7.72.030(1)).

It is undisputed that Plaintiffs' Tiguan came with an owner's manual containing warnings regarding use of the seat heaters. One warning states that the seat heater should not be turned on

"[when] the seat is occupied by a person with a limited perception of pain or temperature." Dkt. 19-2 at 9. Another, with an orange "WARNING" header, states that "people who cannot perceive pain or temperature or who have a limited perception of these . . . could develop burns or undercooling on the back, buttocks, and legs when using seat heating . . . [p]eople with a limited perception of pain and/or temperature must *never* use the seat heating and seat ventilation functions." *Id*. at 10 (emphasis added). Plaintiffs testified that they never read the owner's manual before Ms. LaPrade's injuries on September 4, 2023. Dkt. 18-2 at 5; Dkt. 18-1 at 21–23.

Defendant provided an expert report from Dr. Chason Coelho, a "human factors, safety, and risk management professional," regarding the sufficiency of warnings in the Tiguan owner's manual. Dkt. 19-1 at 1; Dkt. 19-2. Dr. Coelho found that the manual's warnings were consistent with the practice recommended by SAE J3047:

> The vehicle owner's manual or literature provided with the vehicle should describe heated seat operation and also include a warning for heated seat occupants with compromised senses, for example, paraplegics or diabetics.

Dkt. 19-2 at 12–13. Dr. Coehlo further noted that the buttons for the seat heater complied with SAE J3047's requirement to have "a clear indication of the operating status of the seat heater." *Id*. at 4, 13. Dr. Coelho also reviewed the American National Standard for Product Safety Information in Product Manuals, Instructions and Other Collateral Materials, or ANSI Z535.6. *Id*. at 13–14. Dr. Coelho found the Tiguan's warnings consistent with Z535.6's requirements— such as "us[ing] the signal word 'WARNING,' which indicates a hazardous situation that, if not avoided, could result in death or serious injury" and "special formatting" to emphasize certain subsections. *Id*. at 14. Dr. Coelho concluded that the warning and safety information in the manual was consistent with all relevant standards and "adequate to convey to reasonably attentive and prudent individuals in the same or similar situations as Mr. Laprade and Ms. Laprade appropriate hazard information about the subject seat heater." *Id*.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 24

Dr. Coelho also reviewed evidence regarding Ms. LaPrade's behavior—such as the fact that Ms. LaPrade "expressed awareness of how her sensorimotor limitations related to previous and potential temperature injuries," that she had "a substantial amount of benign experience with products that provide contact warming" like heating pads, and that she did not review the owner's manual for the Tiguan. *Id*. at 15, 17. Dr. Coelho compared these facts to research in the field regarding warning perception and adherence, including that high-visibility warnings are unlikely to "reliably capture the attention of a person when that person is not already motivated to seek out a warning." *Id*. at 16. Dr. Coelho concluded that, even if Defendant incorporated the in-vehicle warnings suggested by Plaintiffs, those warnings would likely not have prevented Ms. LaPrade's injuries because she would not have followed them. *Id*. at 17.

This evidence supports Defendant's argument that (1) Defendant's warnings in the Tiguan's owner's manual were sufficient under either the risk-utility or consumer expectations test, and (2) even if they were not, their insufficiency did not cause Ms. LaPrade's injuries. Plaintiffs do not point to any evidence to contest this, instead making a conclusory argument that "the question of sufficiency of a warning is normally one for the jury." Dkt. 29 at 14 (citing *Little v. PPG Indus., Inc.*, 92 Wn.2d 118, 594 P.2d 911 (1979)). This does not relieve Plaintiffs of their duty to "set forth specific facts showing that there is a genuine issue for trial." *Zellmer*, 104 F.4th at 1122 (quoting *Anderson*, 477 U.S. at 256). While it may be true that warnings near the seat heater controls "would have been more effective in alerting users to potential dangers," Dkt. 29 at 14, the WPLA also requires Plaintiffs to prove the existing warnings were *inadequate*. RCW 7.72.030(b), (c). Plaintiffs provide no evidence from which a reasonable jury could make such a finding.

The Court therefore GRANTS Defendant's motion for summary judgment on Plaintiffs' defective warning claim under the WPLA. Dkt. 17.

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 25

## VII.    CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Defendant's *Daubert* motion. Dkt. 22. The Court will allow Mr. Smedsrud to testify about his test results but will not allow him to testify regarding the design or safety of the Tiguan's seat heater.

The Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment. Dkt. 17. Plaintiffs' design defect claim may proceed to trial. Plaintiffs' defective warning claim and Mr. LaPrade's claim for loss of consortium are DISMISSED with PREJUDICE.

Dated this 22nd day of April, 2026.

Tiffany M. Cartwright
United States District Judge

ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE - 26